# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF OHIO
### WESTERN DIVISION

CORINNE C.,[1]                                    Case No. 1:20-cv-1034
        Plaintiff,                                Litkovitz, M.J.

        vs.

COMMISSIONER OF                          **ORDER**
SOCIAL SECURITY,
        Defendant.

Plaintiff Corinne C. brings this action pursuant to 42 U.S.C. §§ 405(g) and 1383(c)(3) for

judicial review of the final decision of the Commissioner of Social Security (Commissioner)

denying plaintiff's application for disability insurance benefits (DIB).  This matter is before the

Court on plaintiff's Statement of Errors (Doc. 12), the Commissioner's response (Doc. 15), and

plaintiff's reply (Doc. 20).

## I.  Procedural Background

Plaintiff filed an application for DIB in May 2017, alleging disability since February 1,

2016, due to bipolar disorder, PTSD, anxiety, depression, insomnia, and migraines.  (Tr. 115-16).

The applications were denied initially and on reconsideration.  Plaintiff, through counsel,

requested and was granted a *de novo* hearing before administrative law judge (ALJ) Renita

Bivins.  Plaintiff and a vocational expert (VE) appeared and testified at the initial ALJ hearing on

September 19, 2019 and the supplemental hearing on March 12, 2020.  (Tr. 43-114).  On April

29, 2020, the ALJ issued an unfavorable decision.  On October 29, 2020, the Appeals Council

---

[1] Pursuant to General Order 22-01, due to significant privacy concerns in social security cases, any opinion, order, judgment or other disposition in social security cases in the Southern District of Ohio shall refer to plaintiffs only by their first names and last initials.

denied plaintiff's request for review, making the ALJ decision the final decision of the Commissioner.

## II. Analysis

### A. Legal Framework for Disability Determinations

To qualify for disability benefits, a claimant must suffer from a medically determinable physical or mental impairment that can be expected to result in death or that has lasted or can be expected to last for a continuous period of not less than 12 months. 42 U.S.C. § 423(d)(1)(A). The impairment must render the claimant unable to engage in the work previously performed or in any other substantial gainful employment that exists in the national economy. 42 U.S.C. § 423(d)(2).

Regulations promulgated by the Commissioner establish a five-step sequential evaluation process for disability determinations:

1) If the claimant is doing substantial gainful activity, the claimant is not disabled.

2) If the claimant does not have a severe medically determinable physical or mental impairment – *i.e.*, an impairment that significantly limits his or her physical or mental ability to do basic work activities – the claimant is not disabled.

3) If the claimant has a severe impairment(s) that meets or equals one of the listings in Appendix 1 to Subpart P of the regulations and meets the duration requirement, the claimant is disabled.

4) If the claimant's impairment does not prevent him or her from doing his or her past relevant work, the claimant is not disabled.

5) If the claimant can make an adjustment to other work, the claimant is not disabled. If the claimant cannot make an adjustment to other work, the claimant is disabled.

*Rabbers v. Comm'r of Soc. Sec.*, 582 F.3d 647, 652 (6th Cir. 2009) (citing 20 C.F.R. §§ 404.1520(a)(4)(i)-(v), 404.1520(b)-(g)). The claimant has the burden of proof at the first four steps of the sequential evaluation process. *Id.*; *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 548 (6th Cir. 2004). Once the claimant establishes a prima facie case by showing an inability to perform the relevant previous employment, the burden shifts to the Commissioner to show that the claimant can perform other substantial gainful employment and that such employment exists in the national economy. *Rabbers*, 582 F.3d at 652; *Harmon v. Apfel*, 168 F.3d 289, 291 (6th Cir. 1999).

### B. The Administrative Law Judge's Findings

The ALJ applied the sequential evaluation process and made the following findings of fact and conclusions of law:

1. [Plaintiff] meets the insured status requirements of the Social Security Act through December 31, 2021.

2. [Plaintiff] has not engaged in substantial gainful activity since February 1, 2016, the alleged onset date (20 CFR 404.1571 *et seq.*).

3. [Plaintiff] has the following severe impairments: migraine syndrome; osteoporosis and osteopenia; a depressive disorder; bipolar disorder; and post-traumatic stress disorder (PTSD) (20 CFR 404.1520(c)).

4. [Plaintiff] does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525 and 404.1526).

5. After careful consideration of the entire record, [the ALJ found] that [plaintiff] has the residual functional capacity to perform medium work as defined in 20 CFR 404.1567(c) except for the following limitations. [Plaintiff] can occasionally climb ramps and stairs, but never climb ladders, ropes, or scaffolds. [Plaintiff] is limited to frequently crouching, but only

occasionally stooping, kneeling, and crawling. [Plaintiff] can work in an environment with moderate noise levels, but no loud noise levels. [Plaintiff] must avoid all exposure to hazards, including unprotected heights of ladders, ropes, or scaffolds, and hazardous machinery. [Plaintiff] can sustain concentration and attention and maintain persistence and pace sufficient to complete simple tasks and detailed tasks, but no complex tasks. [Plaintiff] has no significant issues relating to others, but would do best with tasks that do not require frequent face-to-face interaction with others to complete the task. [Plaintiff] can adapt to routine work processes and environments where major changes are explained in advance.

6. [Plaintiff] is unable to perform any past relevant work (20 CFR 404.1565).[2]

7. [Plaintiff] was born [in] . . . 1956 and was 59 years old, which is defined as an individual of advanced age, on the alleged disability onset date. [Plaintiff] subsequently changed age category to closely approaching retirement age (20 CFR 404.1563).

8. [Plaintiff] has at least a high school education and is able to communicate in English (20 CFR 404.1564).

9. Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the claimant is "not disabled," whether or not [plaintiff] has transferable job skills (See SSR 82-41 and 20 CFR Part 404, Subpart P, Appendix 2).

10. Considering [plaintiff]'s age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 CFR 404.1569 and 404.1569(a)).[3]

11. [Plaintiff] has not been under a disability, as defined in the Social Security Act, from February 1, 2016, through the date of this decision (20 CFR 404.1520(g)).

(Tr. 20-35).

---

[2] Plaintiff's past relevant work was as a customer service representative financial—a skilled, light exertion position. (Tr. 33, 64).

[3] The ALJ relied on the VE's testimony to find that plaintiff would be able to perform the requirements of unskilled, medium jobs in the national economy, such as material expediter (28,000 jobs), office administrative support worker (11,000 jobs), and office clerk (10,000 jobs). (Tr. 34, 69).

### C. Judicial Standard of Review

Judicial review of the Commissioner's determination is limited in scope by 42 U.S.C. § 405(g) and involves a twofold inquiry: (1) whether the findings of the ALJ are supported by substantial evidence, and (2) whether the ALJ applied the correct legal standards. *See Blakley v. Comm'r of Soc. Sec.*, 581 F.3d 399, 405 (6th Cir. 2009); *see also Bowen v. Comm'r of Soc. Sec.*, 478 F.3d 742, 745-46 (6th Cir. 2007).

The Commissioner's findings must stand if they are supported by "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (citing *Consolidated Edison Co. v. N.L.R.B.*, 305 U.S. 197, 229 (1938)).  Substantial evidence consists of "more than a scintilla of evidence but less than a preponderance. . . ." *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007).  In deciding whether the Commissioner's findings are supported by substantial evidence, the Court considers the record as a whole. *Hephner v. Mathews*, 574 F.2d 359 (6th Cir. 1978).

The Court must also determine whether the ALJ applied the correct legal standards in the disability determination.  Even if substantial evidence supports the ALJ's conclusion that the plaintiff is not disabled, "a decision of the Commissioner will not be upheld where the SSA fails to follow its own regulations and where that error prejudices a claimant on the merits or deprives the claimant of a substantial right." *Rabbers*, 582 F.3d at 651 (quoting *Bowen*, 478 F.3d at 746).

### D.  Specific Errors[4]

Plaintiff raises five primary arguments.[5]  First, she argues alternatively that the Appeals Council erred in failing to review new evidence or that a Sentence-Six remand is warranted. Second, plaintiff argues that the ALJ did not properly evaluate the medical opinions of record—in particular, those of treating physicians David G. Leonard, M.D. (psychiatrist), Brandon Lee Waters, M.D., and Joseph A. Nicolas, M.D. (neurologists), and examining physician Peter Ganshirt, Psy.D.  Third, plaintiff argues that the ALJ found the psychological consultants' opinions persuasive but failed to incorporate the moderate mental limitations they assessed into her RFC assessment.  Fourth, plaintiff argues that the ALJ erred in her evaluation of plaintiff's subjective symptoms.  Finally, plaintiff argues that the ALJ failed to consider Listing 11.02 as directed by Social Security Ruling (SSR)[6] 19-4p, which addresses the evaluation of cases involving primary headache disorders.

#### 1.  Sentence-Six remand

Plaintiff initially argues that because the Appeals Council considered Dr. Leonard's July 2020 statement, Dr. Leonard's statement must be treated as part of the administrative record on appeal to this Court.  (*See* Tr. 2).  Plaintiff contends that "[i]f the administrative agency makes . . 

---

[4] Plaintiff does not argue that the ALJ erred in evaluating her osteoporosis and osteopenia; therefore, plaintiff has waived any challenges regarding these impairments.  *See Watts v. Comm'r of Soc. Sec.*, No. 1:16-cv-319, 2017 WL 430733, at *11 (S.D. Ohio Jan. 31, 2017) (argument waived where plaintiff did not "develop it legally or factually in the Statement of Errors"), *report and recommendation adopted*, 2017 WL 680538 (S.D. Ohio Feb. 21, 2017).

[5] The Court addresses plaintiff's arguments in a slightly different sequence than presented in plaintiff's brief.

[6] "Social Security Rulings do not have the force and effect of law, but are 'binding on all components of the Social Security Administration' and represent 'precedent final opinions and orders and statements of policy and interpretations' adopted by the Commissioner."  *Ferguson v. Comm'r of Soc. Sec.*, 628 F.3d 269, 272 n.1 (6th Cir. 2010) (quoting 20 C.F.R. § 402.35(b)(1)).  The Sixth Circuit has refrained from ruling on whether Social Security Rulings are binding on the Commissioner in the same way as Social Security Regulations but has assumed that they are.  *Id.* (citing *Wilson*, 378 F.3d at 549).

. a determination about the persuasiveness of the rebuttal medical opinion, then this should be part of the administrative record subject to review by the Court." (Doc. 20 at PAGEID 3849). Plaintiff cites *Farrell v. Comm'r of Soc. Sec.*, 692 F.3d 767 (7th Cir. 2012) for the proposition that the Appeals Council's decision is subject to judicial review.

In the Sixth Circuit, however, an Appeals Council's decision declining review is not a final reviewable decision for purposes of 42 U.S.C. § 405(g). *See Thick v. Comm'r of Soc. Sec.*, No. 2:18-cv-10154, 2018 WL 6683348, at *15-16 (E.D. Mich. Nov. 29, 2018) (summarizing authority within the Sixth Circuit holding that a federal court's review is limited to the ALJ's decision and the evidence before the ALJ), *report and recommendation adopted*, 2018 WL 6650305 (E.D. Mich. Dec. 19, 2018). The Court cannot consider evidence presented for the first time to the Appeals Council in deciding whether to uphold or reverse the ALJ's decision under sentence four of 42 U.S.C. § 405(g). *See Cline v. Comm'r of Soc. Sec.*, 96 F.3d 146, 148 (6th Cir. 1996) (citing *Cotton v. Sullivan*, 2 F.3d 692, 695-96 (6th Cir. 1993)). Rather, when evidence is presented solely to the Appeals Council, the only issue is whether, in light of that evidence, the matter should be remanded under Sentence Six of § 405(g) for further administrative proceedings. Plaintiff cites no controlling Sixth Circuit authority for her argument otherwise. The Court therefore considers only whether a Sentence-Six remand is warranted.[7]

---

[7] Although an issue raised for the first time in a reply brief is generally not properly before the Court, *see Wright v. Holbrook*, 794 F.2d 1152, 1156 (6th Cir. 1986), the Commissioner addressed a Sentence-Six remand in her response. (Doc. 15 at PAGEID 3816-18). The Court therefore considers plaintiff's responsive argument. *See Emmons v. Comm'r of Soc. Sec.*, No. 2:12-15235, 2014 WL 1304936, at *1 (E.D. Mich. Feb. 13, 2014) (citing *Holloway v. Brush,* 220 F.3d 767, 774 (6th Cir. 2000)) ("[I]f the non-moving raises a new issue in its response, it might be proper for the moving-party to set forth a responsive argument in its reply brief."), *report and recommendation adopted*, 2014 WL 1304938 (E.D. Mich. Mar. 31, 2014).

Under Sentence Six of 42 U.S.C. §405(g), the Court may remand a case to the Social Security Administration "because new evidence has come to light that was not available to the claimant at the time of the administrative proceeding and that evidence might have changed the outcome of the prior proceeding." *Melkonyan v. Sullivan*, 501 U.S. 89, 98 (1991) (citing *Sullivan v. Finkelstein*, 496 U.S. 617, 626 (1990)). A Sentence-Six remand for consideration of additional evidence is warranted only if (1) there is good cause for the failure to incorporate this evidence into the record at the prior hearing, and (2) the evidence is new and material. 42 U.S.C. § 405(g); *see Melkonyan*, 501 U.S. at 98; *see also Bass II v. McMahon*, 499 F.3d 506, 513 (6th Cir. 2007).

"A claimant shows 'good cause' by demonstrating a reasonable justification for the failure to acquire and present the evidence for inclusion in the hearing before the ALJ." *Foster v. Halter*, 279 F.3d 348, 357 (6th Cir. 2001) (citing *Willis v. Sec'y of H.H.S.*, 727 F.2d 551, 554 (1984) (per curiam)). "New" evidence is evidence that was "not in existence or available to the claimant at the time of the administrative proceeding." *Id.* (quoting *Finkelstein*, 496 U.S. at 626). "Material" evidence is evidence that creates "a reasonable probability that the Secretary would have reached a different disposition of the disability claim if presented with the new evidence." *Id.* (quoting *Sizemore v. Sec'y of H.H.S.*, 865 F.2d 709, 711 (6th Cir. 1988)). The party seeking remand bears the burden of establishing these two remand requirements. *Hollon ex rel. Hollon v. Comm'r of Soc. Sec.*, 447 F.3d 477, 483 (6th Cir. 2006) (citing *Foster*, 279 F.3d at 357). *See also Glasco v. Comm'r of Soc. Sec.*, 645 F. App'x 432, 435 (6th Cir. 2016) (citing

*Sizemore*, 865 F.2d at 711 n.1) ("Failure to establish any one of these three elements is fatal to the moving party's request.").

A Sentence-Six remand is not warranted in this case because the evidence at issue is neither new nor material. Plaintiff characterizes Dr. Leonard's July 2020 statement as "rebuttal evidence," i.e., evidence to counter the ALJ's misinterpretation of Dr. Leonard's notes and opinions. (Doc. 20 at PAGEID 3847). However, plaintiff provides no authority to support her argument that so-called "rebuttal" evidence satisfies the requirements for a Sentence-Six remand. As a practical matter, recognizing the concept of "rebuttal evidence" in social security disability appeals would effectively open the floodgates to Sentence-Six remands in every case. As a legal matter, plaintiff does not demonstrate why Dr. Leonard's July 2020 statement, a general narrative regarding plaintiff's mental condition and his treatment thereof, is new. Dr. Leonard could have provided this same opinion prior to the ALJ hearings. *See Foster*, 279 F.3d at 357. In addition, to the extent Dr. Leonard's statement speaks about plaintiff's condition as of the date it was completed (i.e., after the ALJ hearings), it is not material. (*See, e.g.*, Tr. 9 ("[Plaintiff] continues to have depressive and anxious symptoms at home that limit her activity. . . .") (emphasis added)). *See Wyatt v. Sec'y of H.H.S.*, 974 F.2d 680, 685 (6th Cir. 1992) ("Evidence of a subsequent deterioration or change in condition after the administrative hearing is deemed immaterial."). This assignment of error is overruled.

### 2. Medical source opinions

Plaintiff argues that the ALJ failed to apply the treating physician rule; give "good reasons" for failing to afford the opinions of Dr. Leonard, Dr. Nicolas, or Dr. Waters controlling

weight; or balance the factors set out in 20 C.F.R. §§ 404.1527(c)(2)(i) and (ii).[8] Relatedly, plaintiff argues that the ALJ erred by relying on plaintiff's relatively normal mental status examinations and Global Assessment of Functioning (GAF)[9] scores falling consistently within the 50 to 70 range. (*See* Tr. 25, 32-33). Plaintiff points to various treatment notes from several medical sources that, she argues, are consistent with the more significant mental functional limitations assessed by her treating physicians. As it relates to Dr. Leonard specifically, plaintiff argues that the ALJ's decision ignores Dr. Leonard's deposition testimony, incorrectly states that Dr. Leonard did not treat plaintiff for migraines, and mischaracterizes Dr. Leonard's treatment notes—including the ALJ's suggestion that they were not consistently updated.

The Commissioner argues in response that new regulations apply to plaintiff's May 2017 DIB claim. These regulations do not treat medical source statements that fail to include

---

[8] For claims filed prior to March 27, 2017, a treating source's medical opinion on the issue of the nature and severity of an impairment is given controlling weight if it "is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the] case record." 20 C.F.R. § 404.1527(c)(2). *See also Gayheart v. Comm'r of Soc. Sec.*, 710 F.3d 365, 376 (6th Cir. 2013). Also for claims filed prior to March 27, 2017, "[t]he Commissioner is required to provide 'good reasons' for discounting the weight given to a treating-source opinion." *Id.* (citing 20 C.F.R. § 404.1527(c)(2)).

[9] As explained by the court in *Mosley v. Comm'r of Soc. Sec.*:

> GAF is a tool used by health-care professionals to assess a person's psychological, social, and occupational functioning on a hypothetical continuum of mental illness. Diagnostic and Statistical Manual of Mental Disorders 34 (4th ed. 2000) ("DSM–IV"). "The most recent (5th) edition of the Diagnostic and Statistical Manual of Mental Disorders does not include the GAF scale." *Judy v. Colvin*, No. 3:13cv257, 2014 WL 1599562, at *11 (S.D. Ohio Apr. 21, 2014); *see also* Diagnostic and Statistical Manual of Mental Disorders 16 (5th ed. 2013) ("DSM–V") (noting recommendations "that the GAF be dropped from [DSM–V] for several reasons, including its conceptual lack of clarity . . . and questionable psychometrics in routine practice"). . . . A GAF score of 51-60 is indicative of "[m]oderate symptoms (e.g., flat affect and circumstantial speech, occasional panic attacks)" or "moderate difficulty in social, occupational, or school functioning (*e.g.*, few friends, conflicts with peers or co-workers)." *Id.* A GAF score of 61 to 70 indicates "[s]ome mild symptoms (*e.g.*, depressed mood and mild insomnia)" or "some difficulty in social, occupational, or school functioning . . . but generally functioning pretty well." *Id.*

No. 3:14-cv-278, 2015 WL 6857852, at *4 n.4 (S.D. Ohio Sept. 14, 2015).

functional abilities and limitations as "medical opinion" evidence, nor do they require particular deference to treating physicians' opinions.  *See* 20 C.F.R. §§ 404.1513(a)(2) and 404.1520c.  The Commissioner argues that under the applicable regulations, the ALJ properly discussed the supportability and consistency of the medical opinions of record and was not required to discuss other factors.  The Commissioner also argues that Dr. Nicolas did not provide an opinion under the applicable regulations.

In reply, plaintiff argues that the treating physicians' opinions deserved controlling weight even under the new regulations, and the ALJ's opinion lacked a "coherent explanation of reasoning."  *White v. Comm'r of Soc. Sec.*, No. 1:20-cv-588, 2021 WL 858662, at *21 (N.D. Ohio Mar. 8, 2021) ("Although the new standards are less stringent in their requirements for the treatment of medical opinions, they still require that the ALJ provide a coherent explanation of his reasoning.").  In particular, plaintiff argues that the ALJ ignored a brain MRI showing findings consistent with her migraine headache diagnosis (*see* Tr. 3699) and ignored various clinical signs associated with her disorder.  Plaintiff also argues that the ALJ was required to but did not articulate how she considered Dr. Leonard's multiple, similar opinions using the factors in 20 C.F.R. §§ 404.1520c(c)(1)-(5), including Dr. Leonard's long treatment relationship with plaintiff.  Plaintiff also argues that the ALJ erroneously stated that Dr. Leonard did not treat her migraines, overstated her activities of daily living, and exaggerated improvements documented in her treatment records.

11

a. *Dr. Leonard*

There are five opinion statements from Dr. Leonard in the record. In September 2017, Dr. Leonard noted diagnoses of bipolar depression and PTSD. (Tr. 593). Dr. Leonard stated that plaintiff would be absent from work twice per month or more and would be off task 1/3 of the time or more. (Tr. 594). Dr. Leonard noted marked or extreme limitations in most of plaintiff's mental functional abilities (10 of 18). (Tr. 594-96). Dr. Leonard referred to plaintiff's reported issues related to her failed attempt to work at Target and cited her stress, anxiety, and distraction. (*Id.*).

In September 2019, Dr. Leonard completed another statement and participated in a deposition. Dr. Leonard noted diagnoses of bipolar depressions and migraines. (Tr. 3331). Dr. Leonard opined that plaintiff would have moderately severe restrictions in her abilities to maintain attention and concentration for extended periods of time; perform activities within a schedule, maintain regular attendance, and be punctual and within customary tolerances; accept instructions and respond appropriately to criticism from supervisors; and respond appropriately to changes in the work setting. (Tr. 3332-33). Dr. Leonard opined that plaintiff would have severe limitations in her abilities to complete a normal workday and workweek without interruptions from psychologically based symptoms and perform at a consistent pace without an unreasonable number and length of rest periods. (Tr. 3332). In all, Dr. Leonard assessed moderately severe or severe limitations in 5 of twenty mental functional abilities. (Tr. 3331-33). Dr. Leonard also opined that plaintiff would miss four days of work per month and be off task 30% of the workday. (Tr. 3333). In his deposition testimony, Dr. Leonard stated that plaintiff's

symptoms had "been severe at times[,]" and she was expected to "have a fair number of depression and anxious symptoms despite adequate treatment." (Tr. 3325). Dr. Leonard also stated that for "a fair amount of time" plaintiff's GAF scores were in the 50 to 60 range, which would have a "somewhat significant impact on everyday functioning. . . ." (Tr. 3327). Dr. Leonard stated that plaintiff's GAF scores have been between the 50 and 70 range "most of the time [for] the past few years." (*Id.*). He added that plaintiff's symptoms had not been significant enough to fall below that range. (*Id.*).

In January 2020, Dr. Leonard submitted a statement reflecting diagnoses of bipolar disorder, PTSD, and migraine headaches. (Tr. 3432). Dr. Leonard indicated that plaintiff experienced severe migraine headaches two times per week lasting 7 to twelve hours each. (*Id.*). Dr. Leonard opined that this rendered plaintiff incapable of even low stress work, likely to be off task 25% or more of the time, and likely to be absent from work eight days per month. (Tr. 3433-34).

In March 2020, Dr. Leonard provided a narrative statement in which he noted his treatment of plaintiff for bipolar disorder, PTSD, and migraine headaches since 2008. (Tr. 3691). Dr. Leonard stated that plaintiff would require more than two 60-minute unscheduled breaks each day, and the noise and lighting of an office setting would increase her migraines and anxiety. (*Id.*).

The ALJ characterized Dr. Leonard's September 2017, January 2020, and March 2020 opinions as "not persuasive." (Tr. 29, 31). The ALJ characterized Dr. Leonard's two September

13

2019 opinions as "more persuasive" than those "but no more than somewhat persuasive overall." (Tr. 32).

For claims filed on or after March 27, 2017, new regulations apply for evaluating medical opinions. *See* 20 C.F.R. § 1520c (2017); *see also* 82 Fed. Reg. 5844-01, 2017 WL 168819 (Jan. 18, 2017) (technical errors corrected by 82 Fed. Reg. 15132-01, 2017 WL 1105368 (Mar. 27, 2017)). These new regulations eliminate the "treating physician rule" and deference to treating source opinions, including the "good reasons" requirement for the weight afforded to such opinions. *Id*. The Commissioner will "not defer or give any specific evidentiary weight, including controlling weight, to any medical opinion(s) or prior administrative medical finding(s)[10], including those from your medical sources." 20 C.F.R. § 404.1520c(a). Rather, the Commissioner will consider "how persuasive" the medical opinion is. 20 C.F.R. § 404.1520c(b).

In determining the persuasiveness of a medical opinion, the ALJ considers five factors: (1) supportability, (2) consistency, (3) relationship with the claimant, including length of treatment relationship, frequency of examinations, purpose of the treatment relationship, and examining relationship, (4) specialization, and (5) other factors that tend to support or contradict a medical opinion. 20 C.F.R. §§ 404.1520c(c)(1)-(5). The most important factors the ALJ must consider are supportability and consistency. 20 C.F.R. § 404.1520c(b)(2). With respect to the supportability factor, "[t]he more relevant the objective medical evidence[11] and supporting

---

[10] A "prior administrative medical finding" is defined as "[a] finding, other than the ultimate determination about whether the individual is disabled, about a medical issue made by an MC [medical consultant] or PC [psychological consultant] at a prior administrative level in the current claim." 82 Fed. Reg. 5844-01, 2017 WL 168819, at *5850. For clarity, the Court will refer to the limitations opined by the state agency reviewing physicians and psychologists as "assessments" or "opinions."

[11] Objective medical evidence is defined as "signs, laboratory findings, or both." 82 Fed. Reg. 5844-01, 2017 WL 168819, at *5850.

explanations presented by a medical source are to support his or her medical opinion(s) . . . the more persuasive the medical opinions . . . will be." 20 C.F.R. § 404.1520c(c)(1). Similarly, "[t]he more consistent a medical opinion(s) . . . is with the evidence from other medical sources and nonmedical sources in the claim, the more persuasive the medical opinion(s). . . ." 20 C.F.R. § 404.1520c(c)(2). The ALJ is required to "*explain* how [he/she] considered the supportability and consistency factors for a medical source's medical opinions" in the written decision. 20 C.F.R. § 404.1520c(b)(2) (emphasis added). Conversely, the ALJ "may, but [is] not required to, explain" how he/she considered the relationship, specialization, and other factors set forth in paragraphs (c)(3) through (c)(5) of the regulation. *Id.* However, where two or more medical opinions or prior administrative findings about the same issue are equally persuasive, the ALJ must articulate how he or she "considered the other most persuasive factors in paragraphs (c)(3) through (c)(5). . . ." 20 C.F.R. § 404.1520c(b)(3). Finally, the ALJ is not required to articulate how he or she considered evidence from nonmedical sources. 20 C.F.R. § 404.1520c(d).

The ALJ provided several reasons why she discounted Dr. Leonard's opinions. Related to the supportability of Dr. Leonard's opinions, the ALJ noted that the September 2017 opinion was not supported by objective medical evidence and was instead based on plaintiff's subjective reports about her failed work attempt at Target. (Tr. 31-32, discussing (Tr. 594-96)). Dr. Leonard's notations on the report do appear based on plaintiff's subjective reports that she "had trouble following directions" and "missed many days [at] Target." (*See id.*). *See Mitchell v. Comm'r of Soc. Sec.*, 330 F. App'x 563, 569 (6th Cir. 2009) ("A doctor's report that merely repeats the patient's assertions is not credible, objective medical evidence and is not entitled to

15

the protections of the good reasons rule.") (citation omitted). Dr. Leonard otherwise cites only plaintiff's stress and anxiety, generally, as the basis for his opinion. (Tr. 593-96).

The ALJ also contrasted Dr. Leonard's 2017 opinion with his consistent reports of only mild or moderate symptoms and treatment notes reflecting stable mental health. (Tr. 25-26 and 32, referring to, *e.g.*, Tr. 514, 518 (GAF scores of 70 in 2016); Tr. 506, 589, 734, and 798 (GAF scores of 50 between 2017-2019); Tr. 3327 (Dr. Leonard's deposition testimony that plaintiff was generally in the 50 to 70 range in recent years and not worse); Tr. 512 (February 2017: "doing okay overall . . . mood has been good and stable" and mood/affect "better"); Tr. 511 (April 2017: "doing okay overall[,]" "felt better and less fatigued[,]" and mood "good and stable . . . not overly down"); Tr. 508 (June 2017: "ok overall" and mood/affect "relatively stable" and "pretty good"); Tr. 589 (October 2017: "ok overall . . . mood has been ok, not overly down" and mood/affect a "little better today"); Tr. 736 (March 2018:"doing well overall" and "feeling better" with olanzapine); Tr 734 (May 2018: "doing ok overall" and mood/affect "doing okay, some irritability"); Tr. 798 (February 2019: "had been feeling better since starting minocycline" and mood/affect "doing better"); Tr. 796 (May 2019: with minocycline, "depression overall has been better . . . been down less frequently" and down periods do "not seem to linger as long"); and Tr. 3317 (August 2019: "felt ok overall" and mood/affect "doing better"). The ALJ also contrasted Dr. Leonard's September 2017 opinion with his later opinions endorsing significantly fewer mental function limitations across various categories. (Tr. 32; *compare* Tr. 594-96 (serious or extreme limitations in 10 of 18 mental abilities) *with* Tr. 3332-33 (serious or extreme limitations in only five of 20 mental abilities)).

16

While the ALJ found Dr. Leonard's September 2019 opinions more persuasive than his 2017 opinion, she nevertheless found them inconsistent with the treatment records discussed above reflecting relatively stable mental health. (Tr. 32-33). The ALJ also remarked that Dr. Leonard's September 2019 opinions were not supported by objective clinical findings and inconsistent with both the records of other medical sources and plaintiff's activities of daily living. (*Id.*). The ALJ found Dr. Leonard's 2020 opinions not persuasive because they appeared to rely exclusively on plaintiff's subjective reports regarding her migraines (Tr. 30, *comparing* Tr. 3432 (Dr. Leonard's opinion) *with* Tr. 3462 (Dr. Leonard's record)) and were inconsistent with both records showing effective migraine treatments and plaintiff's activities of daily living. (*See* Tr. 29-30).

Plaintiff cites a series of Dr. Leonard's treatment notes to demonstrate that his opinions are supportable—focusing on Dr. Leonard's GAF scores being more frequently at 50 than in the "50 to 70 range" referenced by the ALJ (*see, e.g.*, Tr. 25). (Doc. 12 at PAGEID 3782-83). While some of these records are consistent with the severity of Dr. Leonard's opinions on plaintiff's functional limitations (*see, e.g.*, Tr. 599, 843), they typically reflect ongoing improvement (*see, e.g.*, Tr. 889 (August 2017: migraines were "slightly improved"); Tr. 871 (September 2017: "little better overall since last visit" and "good benefit with eye drops"); Tr. 869 (October 2017: "Mood has been okay, not overly down. . . . Headaches have improved."); Tr. 864 (December 2017: "Overall, [plaintiff] feels ok and anxiety is under moderate control recently."); Tr. 861 (March 2018: plaintiff reported that olanzapine helped depression and that memantine helped migraines, and she felt "clearer cognitively and mood has been better, and

17

headaches improved. . . . [Plaintiff] may be able to travel."); Tr. 857 (May 2018: "ok overall" and headaches improved with memantine; headaches occurred approximately once per week); Tr. 836 (June 2018: plaintiff felt "a little less down"); Tr. 809 (June 2018: "ok overall"); Tr. 807 (August 2018: "more positive" and better energy level); Tr. 805 (October 2018: plaintiff reported feeling "more down this month," but Dr. Leonard noted that this coincided with a change in her diet); Tr. 803 (November 2018: plaintiff reported that she had been "feeling better overall" but felt less so after Zyprexa ran out); Tr. 798 (February 2019: "feeling better since starting minocycline" and "[m]ood has been better"); Tr. 796 (May 2019: with minocycline, "[plaintiff] has been down less frequently, and when she is down it does not seem to linger as long" and "[en]ergy level has been relatively good"); Tr. 3468 (October 2019: plaintiff reported only "somewhat regular headaches" and "some depression and anxiety"); Tr. 3465 (December 2019: Dr. Leonard noted that recent negative mood changes were likely related to new PTSD therapy, but that she was otherwise "ok overall"); and Tr. 3462 (January 2020: plaintiff reports that she is "doing ok apart from headaches")).

Plaintiff also argues that the ALJ failed to consider "signs" in Dr. Leonard's treatment notes, which are "objective medical evidence" under the new regulations. 20 C.F.R. § 404.1502(f). Plaintiff lists several side effects from her medications (without record citations) (Doc. 20 at PAGEID 3837) and certain noted difficulties with adaptability and sustained concentration and persistence (*id.* at Tr. 3838 (referring to Tr. 871)). Plaintiff, however, did not report serious side effects with memantine, timolol, or minocycline (the most successful medications), and Dr. Leonard's one-time observation regarding certain of plaintiff's mental

functional abilities does not undercut the substantial evidence relied upon by the ALJ to find that Dr. Leonard's opinion was not well-supported.

With respect to the consistency of Dr. Leonard's opinions, the ALJ referred to clinical findings from several other medical sources who treated plaintiff that reflected normal mood, affect, behavior, motor activity, speech, language, thought processes, thought content, judgment, attention span, concentration, memory, and ability to follow simple and complex commands. (Tr. 26 and 31-33, referring to Tr. 439, 449-50, 472, 562, and 1239 (primary care 2017-19); Tr. 606, 614, 623-24, 752, 767-68, 775, 1346, and 1427 (neurology 2017-18); Tr. 673, 1899, 2228, and 2287 (gastroenterology 2016-17); and Tr. 3203 (UC Stress Center 2018)). Finally, the ALJ pointed to plaintiff's reported activities that were inconsistent with Dr. Leonard's more severe mental function limitations/restrictions. (Tr. 22-23, 28, and 32, referring, *e.g.*, to Tr. 300 (June 2017 function report: plaintiff reported that she watches television); Tr. 3197-98 (March 2018: plaintiff reported that she is "independent in all basic and instrumental [activities of daily living] and [instrumental activities of daily living;]" helped with her husband's business part time; and enjoyed traveling, eating out, and reading); Tr. 3317 (August 2019: plaintiff reported reading); and Tr. 97, 99, 103 (September 2019 testimony that plaintiff visited family and friends, got along with family and close friends, and went out to dinner). (*See also* Tr. 29, referring to Tr. 508, 511, 519, 589, 734, 739, 803, 807, and 3317 (various records in which plaintiff reported being active and/or walking regularly—sometimes with a neighbor).

Plaintiff highlights a series of notes from her primary care physician (Lauren Ashbrook, M.D.), a radiologist (Daniel L. Wannemacher, M.D.), three neurologists (Dr. Waters, Dr.

19

Nicolas, and Erik Nelson, M.D.), and a neurosurgeon (Mario Zuccarello, M.D.), which she

argues demonstrate that the ALJ failed to review her longitudinal medical treatment (in effect,

arguing that the ALJ failed to consider the consistency of Dr. Leonard's opinions with the record

as a whole under the applicable regulations). (*See* Doc. 12 at PAGEID 3778-79). *See* 20 C.F.R.

§ 404.1520c(c)(2). While these notes do include plaintiff's consistently reported history of

migraines and depression (*see, e.g.*, Tr. 603, 759, 3205), with some reflecting deterioration in

terms of frequency or severity (*see, e.g.*, Tr. 1199 (June 2017 ("Depression worsening b/c

migraines are worsening"); Tr. 620 and 634 (December 2017 records)), the records overall

reflect improvements with medication/treatments, including the reduction in migraine frequency

to approximately one, one-to-two-hour-long migraine per week. (Tr. 1199 (June 2017: "Using

Tylenol #3 for abortive about 6 times per month"); Tr. 603 (September 2017: "Sunglasses help

with photosensitivity. Marijuana helps. . . . Premarin helped headaches. . . . Metoprolol has

helped in the past."); Tr. 659 (September 2017: "Now on timolol drops as abortive. . . . Feeling

so much better. Only 3 [headaches] in the last 3 weeks."); Tr. 611 (October 2017: "Over last 2

weeks, [plaintiff] hasn't had a bad migraine that timolol hasn't helped. . . ."); Tr. 747 (February

2018: a blood patch improved headache frequency to once per week)[12]; Tr. 756 (February 2018:

plaintiff referred to neurosurgery as "headache improved with reinsertion of [cerebrospinal fluid]

and adding blood patch"); Tr. 757 (March 2018: plaintiff reported symptom relief with artificial

cerebrospinal fluid administration and memantine); Tr. 759 (April 2018: note that plaintiff need

only return to neurosurgeon "as needed" and that she should "[c]ontinue conservative

---

[12] Plaintiff emphasizes that this note also includes a statement that timolol drops were not working, but subsequent records (referenced *infra*) reflect continued effectiveness.

treatment") (May 2018: note that plaintiff had not yet tried a number of alternative treatments, such as a thyroid hormone or neuromodulation); Tr. 772 (June 2018: note that migraines were down to "once per week" and that "[b]etween eye drops and/or Advil, migraine resolves in an hour.")[13]; and Tr. 1236 (September 2018: noting migraine frequency of one to two migraines per week and that plaintiff had not yet attempted a particular hormone treatment)). *See also* Tr. 1343 and 1349 (September 2018: note from neurologist Andrew David Massey, M.D., recommending that plaintiff continue with timolol eye drops and noting plaintiff's improvements with marijuana, Premarin, sunglasses for photosensitivity, and memantine); Tr. 3015 (February 2019: note that plaintiff reported "improving frequency of migraines" and that minocycline was helping with depression and headaches); Tr. 3039 (July 2019: note that "[m]emantine ha[d] made the biggest change[,]" and timolol eye drops, ibuprofen, and ice also helped); and Tr. 3396 (September 2019: note that marijuana helped and palmitoylethanolamide (PEA) supplement "resolved" plaintiff's headaches and helped her depression)).

These records from other medical sources are substantial evidence supporting the ALJ's conclusion that Dr. Leonard's 2019 and 2020 opinions—that plaintiff would be off task 25-30% of the day, would miss at least four days of work per month, would have headaches twice per week lasting seven-12 hours each, and would require two 60-minute unscheduled breaks per day—were inconsistent with the record. (*See* Tr. 3333, 3434, and 3691). To the extent that these limitations are consistent with Dr. Leonard's own treatment notes, it is primarily limited to consistency with plaintiff's reported symptoms. (*See, e.g.*, Tr. 3434, which contains a word-for-

---

[13] This record, cited by the ALJ multiple times (*see* Tr. 23, 26-28), includes a summary of the brain MRI results that plaintiff argues the ALJ failed to consider.

word recitation of plaintiff's reported symptoms on the same day as Dr. Leonard's January 2020 report (Tr. 3462)). *See Mitchell*, 330 F. App'x at 569.

Plaintiff also argues that the improvements cited by the ALJ were not tied to any baseline and therefore did not amount to substantial evidence, relying on *Boulis-Gasche v. Comm'r of Soc. Sec.*, 451 F. App'x 488 (6th Cir. 2011). In *Boulis-Gasche*, the ALJ determined that a vague and unspecified improvement in plaintiff's mood noted on two pages of a 55-page treatment record meant that the plaintiff's anxiety and depression had subsided. *Id.* at 493. In context, the record that the ALJ relied upon to show an improvement in mood actually showed an improvement in side effects of psychotropic medications. *Id. Boulis-Gasche* is distinguishable from this case, where the treatment records do show quantifiable improvement in the underlying condition and not only side effects. (*See* Tr. 27 and 30, referring, *e.g.*, to Tr. 611 (October 2017 Dr. Waters note: "Over last 2 weeks, [plaintiff] hasn't had a bad migraine that timolol hasn't helped. . . .") and Tr. 772 (June 2018 Dr. Waters note: "[Between eye drops and/or Advil, migraine resolves in an hour.")). With occasional exceptions, the records discussed above show a trend of improvement without severe side effects beginning in late 2018 and early 2018 with timolol eye drops (*see* Tr. 611) and memantine (*see* Tr. 757) for migraines and with olanzapine (*See* Tr. 736) and minocycline (*see* Tr. 798) for depression.

The Court also does not find the ALJ's decision here akin to that considered in *Gentry v. Comm'r of Soc. Sec.*, 741 F.3d 708, 724 (6th Cir. 2014), as plaintiff contends. The ALJ in *Gentry* discounted the severity of the plaintiff's symptoms based on limited, short-term improvements and the fact that the plaintiff had discounted certain medications. *Id.* at 723. The

22

plaintiff, however, had experienced "progressively worse joint pain" from her impairment, and her medications proved "ineffective in the end" with life-threatening side effects. *Id.* at 724. The court found that the ALJ's conclusion was therefore not consistent with the record as a whole. *Id.* at 723-24. The same disparity is not apparent from the record in this case.

Finally, plaintiff emphasizes that the ALJ failed to appropriately consider Dr. Leonard's long treatment history with plaintiff in a manner consistent with his specialty, arguing that discussion of these factors is required under 20 C.F.R. § 404.1520c(b)(1). That regulation, however, states that in the case of multiple opinions from a single source, the agency "will articulate how [it] considered the medical opinions . . . using the factors listed in paragraphs (c)(1) through (c)(5) . . . *as appropriate*." *Id.* (emphasis added). Even if such discussion were mandatory, the ALJ here duly noted that Dr. Leonard was plaintiff's "longstanding psychiatrist" and referenced notes going back well before plaintiff's alleged onset date—demonstrating her consideration of these factors. (*See* Tr. 25-26).

In sum, the ALJ considered both the supportability and consistency of Dr. Leonard's opinions in her decision. Under the new regulations, the ALJ was not required to discuss any other factor or otherwise articulate "good reasons" for her decision. *See* 20 C.F.R. § 404.1520c(b)(2). The ALJ's evaluation of Dr. Leonard's opinions is therefore supported by substantial evidence. This remains the case even if the ALJ unfairly discounted the reliability of Dr. Leonard's notes (*see* Tr. 26) ("[A] review of his treatment notes raises concerns about the reliability of his findings. . . . [T]he clinical exam portion of his notes . . . is automatically copied from prior visits and he simply left them unchanged. . . .") or understated Dr. Leonard's

23

treatment of plaintiff's migraines (*see* Tr. 30). Either is harmless error. *See Johnson v. Comm'r of Soc. Sec.*, 535 F. App'x 498, 507 (6th Cir. 2013) (citing *Ulman v. Comm'r of Soc. Sec.*, 693 F.3d 709, 714 (6th Cir. 2012)) (harmless error analysis applies where an adverse finding is made based in part on invalid reasons, so long as substantial evidence remains to support the decision).

### b. *Other treating and examining medical sources*

Plaintiff first argues that the ALJ did not apply the treating physician rule to neurologist Dr. Waters' June 2018 opinion. Dr. Waters opined that plaintiff would need unscheduled, at least two-hour-long minimum breaks twice per week; be off task 25% or more per day; and be absent from work four or more days per month—though Dr. Waters prefaced his opinion regarding absenteeism with the statement that he was "unable to say[.]" (Tr. 744). Dr. Waters listed migraine frequency as four to five per month each lasting approximately one to two hours. (Tr. 743). Dr. Waters also acknowledged that plaintiff's prognosis was "fair" and that memantine, timolol, and Advil had "good efficacy." (Tr. 744).

The ALJ found this opinion to be more persuasive than Dr. Leonard's opinion but "not entirely persuasive." (Tr. 30). The ALJ found Dr. Waters' opinion to be unsupported by his own treatment note of the same date as his opinion, which stated that "migraines [were] down to once per week" and "[b]etween eye drops and/or Advil, migraine resolves in an hour." (Tr. 743-44, referring to Tr. 772 (quoted language)). The ALJ also noted the internal inconsistency between Dr. Waters' *daily* off-task and unscheduled break limitations and his notation that she suffered one or two, one-to-two-hour-long headaches *per week*. (*Id.*). The ALJ also noted Dr. Waters' comment that he was "unable to say" how many days plaintiff would be absent,

suggesting that his ultimate quantification was unsupportable speculation—particularly as plaintiff had worked and continued to maintain regular appointments and other activities while suffering from migraines. (Tr. 30-31). *See* 20 C.F.R. § 404.1520c(c)(1).

Elsewhere in her opinion, the ALJ highlights several other records from both Dr. Waters and other medical sources that were inconsistent with the extent of the limitations/restrictions that Dr. Waters recommended. (*See* Tr. 27, referring, *e.g.*, to Tr. 610 (October 2017 note from Dr. Waters that "[t]imolol . . . works great"); Tr. 1342 and 1349 (September 2018 note Dr. Massey that "[i]ntensity of migraines has been improving[,]" plaintiff "[r]eally like[s] response to memantine[,]" "[t]imolol drops still helping as abortive[,]" and plaintiff had "great success with memantine"); Tr. 1423 (February 2019 note from Dr. Waters that minocycline helps depression and headaches, the later having improved in terms of frequency); Tr. 3044 (July 2019 note from CNP that "memantine has helped [plaintiff's] headaches significantly"); and Tr. 3396 (September 2019 note from CNP reflecting one headache/month and that PEA supplement was improving depression and migraines). *See* 20 C.F.R. § 404.1520c(c)(2).

The ALJ discussed the supportability and consistency of Dr. Water's opinion consistent with the applicable regulations. The ALJ's evaluation of Dr. Waters' opinion was based on substantial evidence.

Plaintiff also argues that the ALJ failed to evaluate the opinion of neurologist Dr. Nicolas in her decision at all. The document to which plaintiff refers contains the following statement: "MRI head from October 2017 does show white matter changes that are often seen in patient with migraines as my patient does have." (Tr. 3688). This is the substantive extent of Dr.

Nicolas's statement, and it is not an opinion under the applicable regulations. *See* 20 C.F.R. § 404.1513(a)(2) ("A medical opinion is a statement from a medical source about what you can still do despite your impairment(s) and whether you have one or more impairment-related limitations or restrictions in [physical, mental, sensory, or environmental areas]." The ALJ did not err by failing to evaluate Dr. Nicolas's statement as an opinion.

Plaintiff also argues that the ALJ erred in her evaluation of the September 2019 psychiatric statement provided by Dr. Ganshirt. (Tr. 3339-42). In particular, plaintiff argues that the ALJ failed to take into account Dr. Ganshirt's neuropsychiatric specialty. Dr. Ganshirt found that plaintiff was severely or extremely limited in 14 of 20 mental abilities. (Tr. 3339-41). Dr. Ganshirt opined that plaintiff would be off task more than 30% of each workday and absent from work more than six days per month. (Tr. 3341). The record includes notes from one psychotherapy session leading to his opinion. (Tr. 3343-46).

The ALJ found Dr. Ganshirt's opinion not persuasive. (Tr. 33). The ALJ pointed to the fact that the opinion is devoid of supporting explanations or specific clinical evidence to support the significant mental restrictions/limitations that he endorsed. Dr. Ganshirt checked boxes indicating that his opinion was based on "History & Medical File" and "Psychological Evaluations, Tests & Reports/Opinions" without pointing to particular tests/records that formed the basis for his opinion. (Tr. 3342). *See* 20 C.F.R. § 404.1520c(c)(1). The ALJ then pointed to the fact that Dr. Ganshirt assessed a GAF score of 55, denoting moderate symptomology (*see Mosley*, 2015 WL 6857852, at *4 n.4), while the mental-functional-abilities-assessment portion of his opinion reflected that plaintiff was severely or extremely limited in most areas (15 of 20).

26

(Tr. 3340-41).  Both observations reflect the ALJ's consideration of the supportability of Dr. Ganshirt's opinion.  Regarding consistency, the ALJ referred back to her discussion of numerous records from Dr. Leonard that plaintiff was doing relatively well and from other medical sources showing unremarkable mental status.  (Tr. 33).  *See supra* pp. 16-19; 20 C.F.R. § 404.1520c(c)(2).  The ALJ's decision regarding Dr. Ganshirt's opinion meets the requirements of the applicable medical opinion evaluation regulations and is supported by substantial evidence.

### c.  *Non-examining state agency reviewers*

Plaintiff argues that the ALJ erred by relying on the opinions of the state agency record reviewers Theresa March, D.O., Karla Delcour, Ph.D., and Joseph Edwards, Ph.D, who did not review the entire record.  She also argues that their opinions were not more consistent with the record overall than the opinions of Drs. Leonard, Waters, and Ganshirt.

The ALJ relied on the "persuasive" opinion of Dr. March provided on reconsideration regarding plaintiff's physical impairments.  (Tr. 29, referring to Tr. 137-39).  Dr. March opined that plaintiff was limited to a diminished range of medium work with postural and environmental limitations.  (*Id.*).  The ALJ also relied on the "persuasive" opinions of Drs. Delcour and Edwards, who evaluated plaintiff's mental RFC initially and on reconsideration.  (Tr. 31, referring to Tr. 122-24, 139-41).  Drs. Delcour and Edwards found plaintiff moderately limited in her abilities to maintain attention and concentration for extended periods; to perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerances; complete a normal workday and workweek without interruptions from psychologically based

symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods; to interact appropriately with the general public; to accept instructions and respond appropriately to criticism from supervisors; and to respond appropriately to changes in the work setting. (*Id.*).  They opined that plaintiff would need flexibility in terms of time limits and production standards (Dr. Edwards suggesting 1-to-3-step tasks), limited interaction with others, and routine and predictable duties with changes well-explained and slowly introduced. (*Id.*).

As an initial matter, the fact that Drs. March, Delcour, and Edwards did not review the entire record does not render the ALJ's reliance on their opinions reversible error.  An ALJ is not prohibited from finding a non-examining source more persuasive than an examining source. *See Norris v. Comm'r of Soc. Sec.*, 461 F. App'x 433, 440 (6th Cir. 2012).  But where relevant medical evidence of record post-dates the state agency physicians' review, the ALJ must provide "some indication" that she considered that evidence in conjunction with her decision to rely on the state agency reviewers' opinions. *Blakley*, 581 F.3d at 409 (quoting *Fisk v. Astrue*, 253 F. App'x 580, 585 (6th Cir. 2007)).

The ALJ specifically discussed the supportability and consistency of the opinions of Drs. March, Delcour and Edwards with the record.  The ALJ found that Dr. March's opinion was supported by and consistent with the evidence that she reviewed and that, if anything, evidence post-dating her review showed better migraine control with memantine. (*See* Tr. 29).  The ALJ also found Dr. Delcour and Dr. Edwards' opinions persuasive because they were supported by the evidence that they reviewed. (*See* Tr. 31).  The ALJ also noted that their opinions remained consistent with other evidence in the record post-dating their review, referring to Dr. Leonard's

records reflecting that plaintiff was doing well overall and other records showing stable clinical findings. *See supra* pp. 16-19. The Court therefore finds that the ALJ's decision to credit these opinions as persuasive was based on substantial evidence.

The ALJ's evaluation of the medical source opinions was based on substantial evidence. This assignment of error is overruled.

　　　　3. RFC

　　　　　　a. *Failure to incorporate persuasive opinions into plaintiff's RFC*

Plaintiff argues that the ALJ failed to take into account the "moderate" restrictions recommended by the state agency reviewers on whose opinions she professed to rely. Plaintiff also argues that Dr. Leonard's September 2019 opinion, which the ALJ found "somewhat persuasive" (Tr. 32), did not translate into the ALJ's RCF determination.

The Commissioner points to the Program Operations Manual System (POMS),[14] which explains that the "moderate" restrictions to which plaintiff refers do not constitute a state agency reviewer's ultimate RFC determination. *See* POMS DI § 24510.060(B)(2), available at https://secure.ssa.gov/poms.nsf/lnx/0424510060 (last visited April 25, 2022) ("**Section I is merely a worksheet** to aid in deciding the presence and degree of functional limitations and the adequacy of documentation and **does not constitute the RFC assessment.**"), and POMS DI § 24510.063(B)(2), available at https://secure.ssa.gov/poms.nsf/lnx/0424510063 (last visited April 25, 2022) (where an examiner checks that a claimant is "moderately limited" in performing an activity, "[t]he **degree and extent** of the capacity or **limitation** *must be described in narrative*

---

[14] The POMS is used internally by employees of the Social Security Administration in evaluating Social Security claims. *Davis v. Sec'y of H.H.S.*, 867 F.2d 336, 340 (6th Cir. 1989). It is persuasive but does not have the force and effect of law. *Id.*

*format in Section III*.") (italicized emphasis added). The Commissioner argues that the ALJ did, in fact, incorporate the narrative limitations from the state agency psychological consultants' opinions.

As discussed above, Drs. Delcour and Edwards opined in the narrative portions of their mental RFC determination that plaintiff would need flexibility in terms of time limits and production standards (Dr. Edwards suggesting 1-to-3-step tasks), limited interaction with others, and routine and predictable duties with changes well-explained and slowly introduced. (*Id.*). These are incorporated into the ALJ's RFC, with the exception of their concentration and persistence-related opinions. (*See* Tr. 24). The ALJ later explained the reason for this omission, however, noting that "clinical exams repeatedly documented normal memory findings with no objective deficits in attention or concentration and [plaintiff] was able to follow both simple and complex commands at her neurology visits." (Tr. 31).

As it pertains to Dr. Leonard's "somewhat persuasive" 2019 opinions, Dr. Leonard identified nearly identical mental functional ability limitations as the state agency psychological consultants. (*Compare* Tr. 122-24 and Tr. 139-40 *with* Tr. 3332). The ALJ explained that these limitations were more consistent with the record than Dr. Leonard's 2017 opinion and had the benefit of Dr. Leonard's explanatory deposition testimony. (*See* Tr. 32). Ultimately, however, the ALJ incorporated the narrative functional limitations given by the state agency psychological consultants. The ALJ found that the more extreme off-task and absentee limitations in Dr. Leonard's 2019 opinions were less supported and less consistent with other evidence in the record. This is consistent with her finding that Dr. Leonard's 2019 opinions were only

somewhat as opposed to entirely persuasive. The ALJ's assessment of plaintiff's RFC incorporates the portions of the medical opinions that she found persuasive, and it is supported by substantial evidence.

Plaintiff cites *Mackins v. Astrue*, 655 F. Supp. 2d 770, 772-73 (W.D. Ky. 2009) to support her contention that the ALJ erroneously failed to incorporate the "moderate" limitations assessed by the state agency psychological consultants. The issue in *Mackins*, however, was that the ALJ did not include the state agency reviewers' narrative opinions on the plaintiff's functional abilities in his VE questions or his RFC determination. *Id.* at 773. The Court does not find that *Mackins* demonstrates error in the ALJ's RFC determination here.

### b. *Improper evaluation of subjective symptoms*

Plaintiff also argues that the ALJ did not properly evaluate her subjective symptoms. In particular, plaintiff argues that the ALJ discounted longitudinal treatment notes from Dr. Leonard because of a perceived failure to update them regularly and improperly suggested that plaintiff had simply retired according to a preconceived plan as opposed to stopping work because of her impairments. The Commissioner argues in response that the ALJ sufficiently detailed the ways in which the record did not support the extent of limitation alleged by plaintiff, including normal clinical findings, inconsistent reports regarding her symptoms, and inconsistency between her symptoms and her daily activities. In reply, plaintiff argues that the ALJ failed to consider her headache journal or the limiting effects and symptoms of her migraine headaches in her RFC assessment as directed by SSR 19-4p.

ALJs are to "consider all of the evidence in an individual's record" and determine whether the individual is disabled by examining "all of the individual's symptoms, including pain, and the extent to which the symptoms can reasonably be accepted as consistent with the objective medical evidence and other evidence in the individual's record."  SSR 16-3p, 2016 WL 1119029, at *2.  ALJs also evaluate what the agency formerly termed the "credibility" of a plaintiff's statements about his or her symptoms.  *See, e.g.*, *Rogers*, 486 F.3d at 246-49.  In March 2016, the agency eliminated its use of the term "credibility" and clarified "that subjective symptom evaluation is not an examination of an individual's character. . . ."  SSR 16-3p, 2016 WL 1119029, at *1 (March 16, 2016) (rescinding and superseding SSR 96-7p).  To avoid such mistaken emphasis, this analysis is now characterized as the "consistency" of a claimant's subjective description of symptoms with the record.  *See Lipanye v. Comm'r of Soc. Sec.*, 802 F. App'x 165, 171 n.3 (6th Cir. 2020) (citing *Dooley v. Comm'r of Soc. Sec.*, 656 F. App'x 113, 119 n.1 (6th Cir. 2016)).

A two-step inquiry applies to symptom evaluation.  The ALJ first determines if the record contains objective medical evidence of an underlying medically determinable impairment that could reasonably be expected to produce the individual's symptoms.  SSR 16-3p, 2016 WL 1119029, at *3; *see also* 20 C.F.R. § 404.1529(a); *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 475-76 (6th Cir. 2003).  Step two of symptom evaluation shifts to the severity of a claimant's symptoms.  The ALJ must consider the intensity and persistence of the symptoms to determine the extent to which the symptoms limit an individual's ability to perform work-related activities.

*See* 20 C.F.R. §§ 404.1529(a) and (c); SSR16-3p, 2016 WL 1119029, at *4. In making this determination, the ALJ will consider the following:

(i)      Your daily activities;

(ii)     The location, duration, frequency, and intensity of your pain or other symptoms;

(iii)    Precipitating and aggravating factors;

(iv)    The type, dosage, effectiveness, and side effects of any medication you take or have taken to alleviate your pain or other symptoms;

(v)     Treatment, other than medication, you receive or have received for relief of your pain or other symptoms;

(vi)    Any measures you use or have used to relieve your pain or other symptoms (e.g., lying flat on your back, standing for 15 to 20 minutes every hour, sleeping on a board, etc.); and

(vii)   Other factors concerning your functional limitations and restrictions due to pain or other symptoms.

20 C.F.R. § 404.1529(c)(3).

An ALJ may not consider only objective medical evidence in determining disability unless this evidence alone supports a finding of disability. SSR 16-3p, 2016 WL 1119029, at *5 ("If we cannot make a disability determination or decision that is fully favorable based solely on objective medical evidence, then we carefully consider other evidence in the record in reaching a conclusion about the intensity, persistence, and limiting effects of an individual's symptoms."); 20 C.F.R. § 404.1529(c)(2) ("[W]e will not reject your statements about the intensity and persistence of your pain or other symptoms or about the effect your symptoms have on your

ability to work solely because the available objective medical evidence does not substantiate your statements.").  Moreover,

> [i]t is . . . not enough for our adjudicators simply to recite the factors described in the regulations for evaluating symptoms.  The determination or decision must contain specific reasons for the weight given to the individual's symptoms, be consistent with and supported by the evidence, and be clearly articulated so the individual and any subsequent reviewer can assess how the adjudicator evaluated the individual's symptoms.

SSR 16-3p, 2016 WL 1119029, at *9.  *See also id.* at *7 (noting that the ALJ "will discuss the factors pertinent to the evidence of record").

At the same time, the ALJ is not required to cite or discuss every factor used to evaluate the consistency of a plaintiff's description of symptoms with the record evidence.  *See White v. Comm'r of Soc. Sec.*, 572 F.3d 272, 287 (6th Cir. 2009) ("[T]he ALJ expressly stated that she had considered [the predecessor to SSR 16-3p], which details the factors to address in assessing credibility.  There is no indication that the ALJ failed to do so.  This claim therefore lacks merit. . . .").  Further, the ALJ's determination regarding the consistency of a claimant's subjective complaints with the record evidence is "to be accorded great weight and deference. . . ."  *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 531 (6th Cir. 1997) (citing *Villarreal v. Sec'y of H.H.S.*, 818 F.2d 461, 463 (6th Cir. 1987)).[15]

The ALJ's decision that plaintiff's subjectively reported symptoms were not entirely consistent with the medical and other evidence of record is supported by substantial evidence.

---

[15] The *Walters* court noted that substantial deference was appropriate due in large part to an ALJ's unique observation of a witness's "demeanor and credibility."  With the elimination of the term "credibility" in SSR 16-3p, it is questionable whether an ALJ's observations should be given any deference.  At least one Sixth Circuit decision subsequent to the enactment of SSR 16-3p, however, has retained the notion of deference to the ALJ in the symptom-consistency context.  *See, e.g., Lipanye*, 802 F. App'x at 171 ("It is for the administrative law judge, not the reviewing court, to judge the consistency of a claimant's statements.").

The ALJ discussed the fact that Dr. Leonard frequently reported that plaintiff was generally doing well with respect to depression, and plaintiff's GAF scores did not fall below the level of moderate symptoms. *See* 20 C.F.R. § 404.1529(c)(3)(ii). (*See* Tr. 25 and 32, referring to, *e.g.*, Tr. 514, 518 (GAF scores of 70 in 2016); Tr. 506, 589, 734, and 798 (GAF scores of 50 between 2017-2019); Tr. 3327 (Dr. Leonard's deposition testimony that plaintiff was generally in the 50 to 70 range in recent years and not worse); Tr. 512 (February 2017: "doing okay overall . . . mood has been good and stable" and mood/affect "better"); Tr. 511 (April 2017: "doing okay overall[,]" "felt better and less fatigued[,]" and mood "good and stable . . . not overly down"); Tr. 508 (June 2017: "ok overall" and mood/affect "relatively stable" and "pretty good"); Tr. 589 (October 2017: "ok overall . . . mood has been ok, not overly down" and mood/affect a "little better today"); Tr. 736 (March 2018:"doing well overall" and "feeling better" with olanzapine); Tr 734 (May 2018: "doing ok overall" and mood/affect noted as "doing okay, some irritability"); Tr. 798 (February 2019: "had been feeling better since starting minocycline" and mood/affect "doing better"); Tr. 796 (May 2019: with minocycline, "depression overall has been better . . . been down less frequently" and down periods do "not seem to linger as long"); and Tr. 3317 (August 2019: "felt ok overall" and mood/affect "doing better"). The ALJ also discussed the fact that other medical providers generally noted normal findings in mood, affect, behavior, motor activity, speech, language, thought processes, thought content, judgment, attention span, concentration, memory, and ability to follow commands. *See* 20 C.F.R. § 404.1529(c)(3)(ii). (*See* Tr. 26 and 31-32, referring to Tr. 439, 449-50, 472, 562, and 1239 (primary care 2017-19); Tr. 606, 614, 623-24, 752, 767-68, 775, 1346, and 1427 (neurology 2017-18); Tr. 673, 1899,

2228, and 2287 (gastroenterology 2016-17); and Tr. 3203 (UC Stress Center 2018)). *See* 20 C.F.R. § 404.1529(c)(3)(ii).

Regarding plaintiff's migraine headaches, the ALJ surveyed various preventative and abortive treatments discussed in the record, with timolol eye drops and memantine being the most effective. (*See* Tr. 27, referring to, *e.g.*, Tr. 603 (September 2017: "Sunglasses help with photosensitivity. Marijuana helps. . . . Premarin helped headaches. . . . Metoprolol has helped in the past."); Tr. 659 (September 2017: "Now on timolol drops as abortive. . . . Feeling so much better. Only 3 [headaches] in the last 3 weeks."); Tr. 611 (October 2017: "Over last 2 weeks, [plaintiff] hasn't had a bad migraine that timolol hasn't helped. . . ."); Tr. 747 (February 2018: a blood patch improved headache frequency to once per week); Tr. 756 (February 2018: plaintiff referred to neurosurgery as "headache improved with reinsertion of [cerebrospinal fluid] and adding blood patch"); Tr. 757 (March 2018: plaintiff reported symptom relief with artificial cerebrospinal fluid administration and memantine); Tr. 759 (April 2018: note that plaintiff need only return to neurosurgeon "as needed" and that she should "[c]ontinue conservative treatment"); and Tr. 772 (June 2018: note that migraines were down to "once per week" and that "[b]etween eye drops and/or Advil, migraine resolves in an hour.")). *See* 20 C.F.R. § 404.1529(c)(3)(ii). As discussed above, these improvements related to plaintiff's symptoms (not just side effects) and were measurable. *See* 20 C.F.R. § 404.1529(c)(3)(iv).

The ALJ also referred to the fact that one of plaintiff's primary purported migraine triggers, light (both natural (Tr. 3039) and fluorescent (Tr. 559)), was nevertheless used as a

therapy for depression. (Tr. 28, referring to Tr. 3344).[16] *See* 20 C.F.R. § 404.1529(c)(3)(iii).

The ALJ also contrasted plaintiff's reports that she had difficulty watching television (Tr. 96),

reading (Tr. 300), doing housework (Tr. 298-99), and being social/leaving her home (Tr. 300-01)

with other portions of the record suggesting otherwise (*see* Tr. 96, 3206, 3317, and 3345

(testimony and medical records in which plaintiff reported reading); Tr. 99-100 (testimony in

which plaintiff described doing limited cooking, laundry, and housework; eating out; and

separate, regular meetings for coffee with her sister and neighbor), Tr. 3206 (plaintiff reported

enjoying traveling and eating out); Tr. 300 and 3345 (plaintiff reported watching television); Tr.

3197 (plaintiff reported being independent in all basic and instrumental activities of daily living);

and Tr. 511, 519, 589, 739, 803, and 3317 (plaintiff reported walking regularly for exercise by

herself, with dogs, or with a neighbor)). (*See* Tr. 28-29). *See* 20 C.F.R. § 404.1529(c)(3)(i).

Relatedly, the ALJ discussed the fact that plaintiff's asserted relief measures appeared

inconsistent with these activities. (*See* Tr. 27, referring to Tr. 54-55 and 112-12 (plaintiff's

testimony that she would lay in bed all day with the shades drawn, an ice pack on her head, and

sunglasses on when experiencing a migraine or depression); *see also, e.g.*, Tr. 620 (despite this

testimony, plaintiff presented to Dr. Waters for an appointment with an active migraine)). *See* 20

C.F.R. § 404.1529(c)(3)(vi)

The ALJ also referenced some inconsistency in the record regarding plaintiff's

motivation for stopping work. The ALJ discussed that while plaintiff testified and sometimes

---

[16] Although plaintiff argues that that light therapy was prescribed by Dr. Leonard for migraine treatment (Doc. 12 at PAGEID 3783), review of the associated records suggests that this treatment was targeting plaintiff's depression. (*See* Tr. 3344 (Dr. Ganshirt: "[plaintiff] uses a fluorescent light and gets as much natural sunlight as she can for her depression") and Tr. 863 (Dr. Leonard: "[plaintiff] more down despite light therapy")).

37

reported to her treating physicians that she stopped working due to her impairments, some medical records reflected that plaintiff had planned to retire prior to her alleged onset date. (Tr. 29, referring to Tr. 424 (May 2016 note from Dr. Ashbrook that migraines had initially "[i]mproved with retirement"]) and Tr. 527 (pre-alleged onset record from Dr. Leonard stating that plaintiff "will be finishing work in January 2016")).

Plaintiff argues that the ALJ erred by making a negative inference regarding plaintiff's subjective symptoms due to repetition in Dr. Leonard's notes (*see* Tr. 26) and noting potential inconsistency (*see* Tr. 28) between plaintiff's reported relief with marijuana use (*see, e.g.*, Tr. 789) and the fact that she identified fumes as a migraine trigger (Tr. 3455). These observations, if errors, are harmless. The same is true of the ALJ's observation regarding certain records reflecting that plaintiff retired according to a non-impairment-related plan. The ALJ made these observations alongside her discussion of numerous records summarized above pertaining to plaintiff's daily activities, the intensity of her symptoms, precipitating factors, the effectiveness of her medications, the effectiveness other treatments, and how she relieved the symptoms of her impairments. *See* 20 C.F.R. § 404.1529(c)(3). The ALJ's decision regarding plaintiff's subjective symptoms is supported by substantial evidence. *See Johnson*, 535 F. App'x at 507.

In addition, while plaintiff argues that the ALJ overstated plaintiff's activities of daily living, the ALJ properly considered this evidence and testimony to evaluate plaintiff's alleged symptom severity. *See Temples v. Comm'r of Soc. Sec.*, 515 F. App'x 460, 462 (6th Cir. 2013) (citing *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 532 (6th Cir. 1997)) ("[T]he ALJ

properly considered [the plaintiff's ability to perform day-to-day activities] as one factor in determining whether [the plaintiff's] testimony was credible.").

Finally, plaintiff argues that the ALJ erred by failing to consider her headache journals. Plaintiff refers primarily to the portion of SSR 19-4p that deals with how the agency is to identify primary headache disorder as a medically determinable impairment, *see* 2019 WL 4169635, at *4, 6 & n.22—though the ALJ did identify migraine syndrome as a severe impairment. (Tr. 21). The Commissioner argues that the ALJ is not required to analyze every piece of relevant evidence. *See Bailey v. Comm'r of Soc. Sec.*, 413 F. App'x 853, 855 (6th Cir. 2011) (citing 20 C.F.R. § 404.953). The Commissioner notes that this is particularly so where plaintiff's migraine calendars would have been redundant of her testimony, which the ALJ determined was not entirely consistent with the record. (*See, e.g.*, Tr. 375 (Plaintiff's June 2018 migraine calendar reflects four migraines within the first two weeks of the month lasting several hours each, but she reported to Dr. Waters that same month that she was having only approximately one migraine per week that resolved within an hour (Tr. 772).). Under SSR 19-4p, when assessing primary headache disorder in connection with plaintiff's RFC, the primary inquiry is the "[c]onsistency and supportability between reported symptoms and objective medical evidence. . . ." 2019 WL 4169635, at *8. As discussed above, the ALJ did so here and based her RCF determination on substantial evidence.

The ALJ's RFC determination accounts for the limitations endorsed in the opinions that she found persuasive and appropriately considers the 20 C.F.R. § 404.1529(c)(3) factors. This assignment of error is overruled.

4. Listing 11.02

Plaintiff argues that the ALJ erred by failing to follow SSR 19-4p in evaluating plaintiff's migraine headaches at step three of the sequential evaluation process. Plaintiff argues that the ALJ failed to consider whether her migraine headaches medically equaled Listing 11.02 (Epilepsy). *See* SSR 19-4p, 2019 WL 4169635, at *7. Specifically, plaintiff argues that the ALJ failed to "make every reasonable effort to obtain the results of laboratory tests" or consider the fact that her migraines persisted despite treatment. (Doc. 12 at PAGEID 3785 (quoting SSR 19-4p, 2019 WL 4169635, at *6)).

The Commissioner argues in response that plaintiff largely focuses on parts of SSR 19-4p that pertain to the identification of migraine headaches as a medically determinable impairment, which is not at issue in this case. (*See* Tr. 21 (the ALJ identified migraine syndrome as a severe impairment)). The Commissioner also argues that plaintiff's argument with respect to Listing 11.02 is undeveloped, as she does not identify the specific evidence demonstrating that she could meet every component of the Listing.

The Court finds that plaintiff has sufficiently developed a legal and factual argument with respect to Listing 11.02. (*See* Doc. 12 at PAGEID 3785-87; Doc. 20 at PAGEID 3846-47). *See Watts*, 2017 WL 430733, at *11. The Court therefore considers the merits of this assignment of error.

At step three, plaintiff carries the burden to show that she has an impairment or combination of impairments that meets or medically equals the criteria of an impairment listed in

20 C.F.R. § 404, Subpart P, App. 1. *Foster v. Halter*, 279 F.3d 348, 354 (6th Cir. 2001); 20 C.F.R. § 404.1520(a)(4)(iii). If a claimant meets all of the criteria of a listed impairment, she is disabled; otherwise, the evaluation proceeds to step four. 20 C.F.R. §§ 404.1520(d)-(e); *Bowen v. Yuckert*, 482 U.S. 137, 141 (1987); *see also Rabbers*, 582 F.3d at 653 ("A claimant must satisfy all of the criteria to meet the listing.").

In evaluating whether a claimant meets or equals a listed impairment, an ALJ must "actually evaluate the evidence, compare it to [the relevant listed impairment], and give an explained conclusion, in order to facilitate meaningful judicial review." *Reynolds v. Comm'r of Soc. Sec.*, 424 F. App'x 411, 416 (6th Cir. 2011). Otherwise, "it is impossible to say that the ALJ's decision at Step Three was supported by substantial evidence." *Id.* (citations omitted). The ALJ "need not discuss listings that the [claimant] clearly does not meet, especially when the claimant does not raise the listing before the ALJ." *Sheeks v. Comm'r of Soc. Sec.*, 544 F. App'x 639, 641 (6th Cir. 2013). "If, however, the record 'raise[s] a substantial question as to whether [the claimant] could qualify as disabled' under a listing, the ALJ should discuss that listing." *Id.* at 641 (quoting *Abbott v. Sullivan*, 905 F.2d 918, 925 (6th Cir. 1990)); *see also Reynolds*, 424 F. App'x at 415-16 (holding that the ALJ erred by not conducting any step three evaluation of the claimant's physical impairments, when the ALJ found that the claimant had the severe impairment of back pain).

Where an ALJ does not discuss a Listing, the Court "must determine whether the record evidence raises a substantial question as to [a claimant's] ability to satisfy each requirement of the listing." *Smith-Johnson v. Comm'r of Soc. Sec.*, 579 F. App'x 426, 433 (6th Cir. 2014). To

raise a substantial question, "[a] claimant must do more than point to evidence on which the ALJ could have based" her Listing finding. *Id.* at 432 (quoting *Sheeks*, 544 F. App'x at 641-42). "Rather, the claimant must point to specific evidence that demonstrates he reasonably could meet or equal every requirement of the listing." *Id.* (citing *Sullivan v. Zebley*, 493 U.S. 521, 530 (1990)). "Absent such evidence, the ALJ does not commit reversible error by failing to evaluate a listing at Step Three." *Id.* at 433; *see also Forrest v. Comm'r of Soc. Sec.*, 591 F. App'x 359, 366 (6th Cir. 2014) (finding harmless error when a claimant could not show that he could reasonably meet or equal a Listing's criteria).

SSR 19-4p indicates that primary headache disorder is not a listed impairment, but directs consideration of Listing 11.02B or 11.02D, instead, as the "most closely analogous listed impairment[s]." SSR 19-4p, 2019 WL 4169635, at *7. Plaintiff argues that Listing 11.02B applies to her migraines. (*See* Doc. 20 at PAGEID 3846). In pertinent part, this Listing describes:

> B. Dyscognitive seizures (see 11.00H1b), occurring at least once a week for at least 3 consecutive months (see 11.00H4) despite adherence to prescribed treatment (see 11.00C). . . .

20 C.F.R. Part 404, Subpart P, App.1, § 11.02.

In determining whether a claimant's impairments are equivalent to Listing 11.02B, the ALJ is to consider:

> [a] detailed description from an [acceptable medical source] of a typical headache event, including all associated phenomena (for example, premonitory symptoms, aura, duration, intensity, and accompanying symptoms); the frequency of headache events; adherence to prescribed treatment; side effects of treatment (for example, many medications used for treating a primary headache disorder can produce drowsiness, confusion, or inattention); and limitations in functioning that

42

> may be associated with the primary headache disorder or effects of its treatment,
> such as interference with activity during the day (for example, the need for a
> darkened and quiet room, having to lie down without moving, a sleep disturbance
> that affects daytime activities, or other related needs and limitations).

SSR 19-4p, 2019 WL 4169635, at *7.

The Court concludes that plaintiff has raised a substantial question as to Listing 11.02. The ALJ's decision does not include discussion of Listing 11.02B or SSR 19-4p.  Largely missing from the ALJ's decision is any discussion of portions of treatment records containing "detailed description[s] . . . of a typical headache event, including all associated phenomena (for example, premonitory symptoms, aura, duration, intensity, and accompanying symptoms). . . ." SSR 19-4p, 2019 WL 4169635, at *7.  Dr. Waters indicated in his opinion statement that plaintiff's migraines were accompanied by nausea, vomiting, phonophobia, photophobia, throbbing pain, inability to concentrate, mood changes, exhaustion, visual disturbance, impaired sleep, and pain worsened by activity (Tr. 743), at least some of which are included in his treatment notes (*see, e.g.*, Tr. 747-48 (tinnitus, photophobia); Tr. 751-52 (photophobia, nausea, sleep disturbance, and decreased concentration)).  (*See also, e.g.*, Tr. 3039 (2019 treatment notes recording migraines with "pounding and throbbing" pain, photo/phonophobia, severe nausea, phantom smells, light-headedness, and blurry vision)).

The ALJ also did not mention plaintiff's headache calendars.  While the Commissioner cites authority for the general proposition that the ALJ need not analyze or address every piece of evidence (*see* Doc. 15 at PAGEID 3813 n.6), the analysis of such evidence in this particular case is directly relevant to the impairment under consideration and relevant Listing, on which the ALJ was silent.  *See* SSR 19-4p, 2019 WL 4169635, at *6 n.22 ("We will . . . consider evidence from

a person's 'headache journal' when it is part of the record, either as part of the treatment notes or as separate evidence, along with all evidence in the record."). Plaintiff's headache calendars show she meets the frequency requirement of Listing 11.02B (headaches occurring at least once a week for at least three consecutive months). (*See* Tr. 328, 330-31, 333-34, 336). The medical records likewise support the frequency of plaintiff's migraines under Listing 11.02B. (*See, e.g.*, Tr. 1361 (September 29, 2018 neurology note recording history of weekly migraines in February and June 2018, 12 migraines in August 2018, and seven migraines in September 2018); Tr. 889 (August 17, 2017 Dr. Leonard note reflecting three migraines per week); Tr. 857 (May 17, 2018 Dr. Leonard note reflecting weekly migraines); and Tr. 3462 (January 30, 2020 Dr. Leonard note reflecting twice weekly migraines)). These records raise a substantial question as to plaintiff's ability to satisfy the frequency requirement of Listing 11.02B.

SSR 19-4p also requires the ALJ to consider the claimant's adherence to prescribed treatment and the side effects from such treatment. The ALJ did not discuss plaintiff's adherence to or side effects from her medications or other treatments, even though there is evidence in the record supporting the conclusion that plaintiff's migraines were intractable for at least a period of time exceeding 12 months. (*See, e.g.*, Tr. 747, 1349 (February and September 2018 notes from neurologist Dr. Massey)). As to limitations on plaintiff's functioning, most of the ALJ's discussion is tied to plaintiff's mental health impairments and associated Listings (12.04 and 12.15) as opposed to her migraine headaches. (*See* Tr. 23 and 26).[17] *Cf. Jandt v. Saul*, No. 1:20-

---

[17] The ALJ did specifically note plaintiff's reported television watching as inconsistent with her report that television was a migraine trigger. (*See* Tr. 28). The ALJ referenced documents for this observation, however, that do not bear on whether plaintiff is limited in that ability while experiencing migraines. (*See* Tr. 300 ("sometimes watch tv if my head doesn't hurt") and Tr. 3345 (plaintiff described an average day, not a migraine day, as involving "stay[ing] [at] home watching television or reading")).

cv-45, 2021 WL 467200, at *10 (W.D. Ky. Feb. 9, 2021) ("[T]he ALJ's 'paragraph B criteria' findings for Listing 12.04 and RFC findings at step four do not address the impact on functioning when Plaintiff experiences a migraine headache. . . .") (citing SSR 19-4p, 2019 WL 4169635, at *7) (remaining citation omitted).

 Where an ALJ finds that a claimant's impairment does *not* medically equal a Listing, the ALJ "is not required to articulate specific evidence supporting . . . her finding that the individual's impairment(s) does not medically equal a listed impairment[,]" SSR 17-2p, 2017 WL 3928306, at *4, and an ALJ's reasoning contained in other parts of the sequential evaluation process may present sufficient justification for her decision at step three. *See Snoke v. Astrue*, No. 2:10-cv-1178, 2012 WL 568986, at *6 (S.D. Ohio Feb. 22, 2012), *report and recommendation adopted*, 2012 WL 1058982 (S.D. Ohio Mar. 28, 2012). Here, however, the ALJ did not even mention Listing 11.02. The ALJ acknowledged evidence in the record that plaintiff experienced weekly migraines from her onset date until even after she began her memantine/timolol regimen. (*See* Tr. 27). The record evidence discussed above strongly suggests plaintiff's migraine impairment may have equaled Listing 11.02B for at least a period of time, potentially entitling plaintiff to a closed period of disability, and warranted consideration by the ALJ under SSR 19-4p. *See Willis v. Comm'r of Soc. Sec.*, No. 2:19-cv-11689, 2020 WL 1934932, at *7 (E.D. Mich. Apr. 22, 2020 ("The record evidence on severity, frequency, and adherence, coupled with counsel's direct request, merited, at least, an express consideration of Listing 11.02 and a more robust explanation of equivalency, if not also a medical expert's opinion on Listing 11.02 equivalence."). This assignment of error is therefore sustained.

Based on the foregoing, plaintiff's Statement of Errors (Doc. 12) is **SUSTAINED IN PART AND OVERRULED IN PART** and the Commissioner's non-disability finding is **REVERSED AND REMANDED FOR FURTHER PROCEEDINGS** consistent with this Order. In particular, the ALJ on remand shall reevaluate plaintiff's impairments at step three of the sequential evaluation, obtaining the assistance of a medical expert if warranted, and provide a full discussion of Listing 11.02B equivalency, including whether a closed period of disability is appropriate. *See* SSR 17-2p, 2017 WL 3928306, at *3; SSR 19-4p, 2019 WL 4169635, at *7-8.

Date:   5/18/2022

Karen L. Litkovitz
United States Magistrate Judge